UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

JOSE LEBRON,  :

                        Plaintiff,  :

       -against-  :

JO ANNE B. BARNHART,  :
Commissioner of Social Security,

                       Defendant.
--------------------------------------------------------x

04 Civ. 7389 (PAC)(KNF)

ORDER

HONORABLE PAUL A. CROTTY, United States District Judge:

Plaintiff Jose Lebron ("Lebron") brings this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C. § 1383(c)(3) seeking judicial review of the final decision of the Commissioner of the Social Security Administration ("SSA") denying his 1982 and 1985 applications for Supplemental Security Income ("SSI") benefits, which were reconsidered in 2001 following the Dixon and Stieberger class action decisions.[1] Lebron moves for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, seeking an order: (1) reversing the final decision of the Commissioner, and (2) remanding the matter for a benefits calculation. The Commissioner cross-moves for judgment affirming the final decision that Lebron was not

---

[1] Under Dixon v. Sullivan, 792 F. Supp. 942 (S.D.N.Y. 1992), aff'd sub nom., Dixon v. Shalala, 54 F.3d 1019 (2d Cir. 1995), New York claimants whose SSI applications were denied between June 1, 1976 and July 19, 1983, because their impairments were insufficiently severe, were permitted to resubmit their claims so that each claimant's age, education, and work history could be accounted for in determining the claimant's ability to work. Under Stieberger v. Sullivan, 792 F. Supp. 1376, modified 801 F. Supp. 1079 (S.D.N.Y. 1992), persons who: (1) had a disability claim denied between October 1, 1981 and July 2, 1992, because they were not disabled; (2) were New York State residents at the time of the denial or termination of either (a) their claim for, or (b) their entitlement to, continued disability benefits; and (3) had a disability claim denied or terminated at any level of review between October 1, 1981 and October 17, 1985, or at the ALJ or Appeals Council level between October 18, 1985 and July 2, 1992, were allowed to have their claims readjudicated. When the SSA reconsidered Lebron's applications, his Dixon readjudication period was established as July 28, 1982 through September 3, 1985, and his Stieberger readjudication period was established as July 28, 1982 through February 11, 1998, making his 1982 and 1985 applications eligible for reconsideration.

1

disabled during the periods in question on the grounds that substantial evidence supports such a finding.

The case was assigned to Magistrate Judge Kevin Nathaniel Fox, who issued a Report and Recommendation ("R&R") on April 30, 2007. Both parties filed objections to the R&R.

**PROCEDURAL HISTORY**

Between 1977 and 1998, Lebron filed five applications for SSI benefits.[2] In each application, Lebron claimed that he was disabled due to mental retardation and congenital foot and hand deformities. After the first three applications were denied, Lebron's fourth application, filed in 1996, was approved and he was awarded benefits.[3] In 2001, pursuant to the Dixon and Stieberger class action decisions, the SSA began the process of reopening Lebron's 1982 and 1985 applications for SSI benefits. On September 26, 2001, the Commissioner found that Lebron was not disabled during the established readjudication periods and denied his claims again. Lebron requested a hearing one week later on October 2, 2001. On February 13, 2003, a hearing was held before Administrative Law Judge ("ALJ") Kenneth G. Levin. On July 13, 2003, the ALJ issued a final decision finding Lebron was not disabled during the readjudication periods. The Appeals Council denied Lebron's request for review on July 16, 2004, thereby rendering the Commissioner's decision final.

On September 16, 2004, the Plaintiff initiated the instant action seeking review of the Commissioner's decision. He moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), and the Commissioner cross-moved for judgment on the pleadings.

---

[2] Lebron filed for SSI benefits in 1977, 1982, 1985, 1996, and 1998.
[3] Lebron's 1996 application was initially denied. However, on April 5, 1999, the SSA Office of Hearings and Appeals ("Appeals Council") reversed an administrative law judge's decision and found Lebron "disabled" within the meaning of the Social Security Act. Lebron was granted retroactive benefits and has been receiving continuing monthly disability benefits since April 8, 1996.

# FACTUAL BACKGROUND[4]

## I. Personal History

Jose Lebron was born in Puerto Rico on June 12, 1936, with congenital deformities of the hands, feet and face, and mental impairments. Lebron did not learn to walk until the age of nine. He attended four years of school in Puerto Rico but never learned to read or write in Spanish and has limited English-language proficiency. Lebron moved to New York when he was twenty-three years old and has always lived with his mother (now deceased) or his sister. He has never had a romantic relationship, and does not have any long-lasting friendships. Due to his mental condition, Lebron cannot shop for his own food or make his own meals. Lebron has held several jobs throughout his life and, although he traveled on public transportation to and from those jobs, he always traveled with a co-worker and/or after his sister took several months to teach him the route.

## II. Work History

From 1970 to 1974, Lebron worked full-time at a factory in New Jersey packing small items (such as clothing hangers and perfume) into boxes. The job entailed standing, but no significant lifting or carrying, and he commuted to the factory with a friend via public bus. The factory eventually closed down, and Lebron found work at a bodega owned by another friend. Lebron worked there from 1974 to 1978, stocking shelves and making nearby deliveries of non-heavy items. The bodega eventually went out of business and Lebron found another job in the Welfare Employment Program, a job which he worked as a condition of receiving public assistance benefits. He worked forty-two hours every other week (one week on, one week off), removing garbage from public spaces, and sweeping and cleaning restrooms.

---

[4] Unless otherwise noted, the factual background, including the medical and work history, is drawn from the R&R issued by Magistrate Judge Fox on April 27, 2007.

### III. Medical History

#### a. Medical Conditions

At the February 2003 hearing before ALJ Levin, Lebron testified that he has experienced problems with his hands and feet since birth. (Administrative Record ("AR")[5] 395-97, 399.) He explained that he has always experienced "numbness" in his hands and pain in his feet. (AR 16.) When he worked, Lebron's hands would "hurt." (AR 396.)

After complaining of pain in his hand in July 1982, an X-Ray confirmed a deformity of the distal radius with an overgrowth of the radial aspect of the radius. (AR 150-51.) In October 1982 and then again in February 1983, Lebron had surgery on his left wrist, but continued to experience pain. (AR 172, 174, 219.) In March 1990, Lebron complained of right arm weakness and also reported experiencing difficulty when trying to grip objects. (AR 326.)

After complaining of pain in his feet in August 1982, an X-Ray revealed halux valgus, commonly known as bunions, and an abnormal talus bone. (AR 154, 237.) To address this condition, Lebron was prescribed orthopedic shoes, as well as the medications Tylenol and Naprosyn. (AR 243, 252, 301-03, 329.) In addition to reporting problems with his hands and feet, Lebron sought treatment for ailments including gastritis and perianal infections. (AR 17.)

##### i. Medical Diagnoses

On April 25, 1996, Dr. Stephen Rocker, a consultative physician, examined Lebron. (AR 430-31.) He noted that Lebron displayed decreased mobility with respect to his thumbs and had diminished range of motion at the joints in his hands. (AR 431.) Dr. Rocker opined that Lebron would be "unable to perform activity requiring strong grasping or fine dexterity or repetitive

---

[5] The Commissioner submitted a comprehensive Administrative Record, which includes the transcript from the ALJ hearing that took place on February 13, 2003 and the Hearing decision, which is dated July 13, 2003.

4

manipulation of the hands." (AR 431.) He also concluded that Lebron would be "unable to perform activities requiring repetitive strength or dexterity involving the feet." (AR 431.)

During the 2003 administrative hearing, expert witness Dr. Charles Plotz testified that Lebron "was born with brachy dactylus, short fingers, rather irregularly short fingers, and with a valgus [deformity] of both lower extremities." (AR 409.) Dr. Plotz further testified that during the relevant period (that is, the period of time for which Lebron was seeking disability benefits), Lebron did not have a medical condition that would have left him functionally impaired for at least twelve continuous months.[6] (AR 410.)

Vocational expert Miriam Greene testified at the administrative hearing concerning Lebron's employment capabilities during the relevant time periods. (AR 423-29.) In response to ALJ Levin's hypothetical question about what type of unskilled, medium-level jobs are available to someone of Lebron's age, education, and experience, Greene concluded that a person with such a background could be a factory packer or a laundry worker. (AR 425.) Greene testified that Lebron worked as a factory packer during the Dixon readjudication time period, but noted that he only performed this unskilled, medium-level job at the light level.[7] (AR 423.)

### b. Mental and Developmental Conditions and Diagnoses

Lebron began treatment at the St. Mark's Institute for Mental Health in November 1997. (AR 108.) He sought treatment from St. Mark's eighteen times over the course of six months. (AR 108.) As part of that treatment, Lebron underwent psychological testing, including the

---

[6] Under the Social Security Act, the Commissioner will find a claimant disabled if the claimant demonstrates the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which … has lasted … for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

[7] To determine the physical exertion requirements of work in the national economy, the Social Security Administration classifies work as sedentary, light, medium, heavy and very heavy. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of the arm or leg controls." 20 C.F.R. § 404.1567.

5

Wechsler Adult Intelligence Scale-Revised ("WAIS-R") Test. (AR 109.) Dr. Maria Malinowska reported that Lebron had a verbal intelligence quotient ("IQ") of 59, a performance IQ of 61, and a full scale IQ of 57, placing him in the mildly mentally retarded range. (AR 110.)

In addition to the WAIS-R Test, Lebron underwent the following tests: (1) the Bender Gestalt Test; (2) the Trail Making Test; (3) the Tactile Performance Test; and (4) the Wechsler Memory Test. (AR 108-11.) Based on the results of these tests, Dr. Malinowska reported the following findings: "a serious impairment of visual scanning ability and psychomotor retardation" (AR 110); "organic brain dysfunction" (AR 111); "serious impairment of the short term memory" (AR 111); "frequent" to "constant" deficiencies of concentration, persistence or pace (AR 113); possible "inability to appropriately accept supervision" in stressful circumstances (AR 113); and depression (AR 113).

On May 12, 1998, Dr. Rochelle Sherman, a consultative psychologist, performed an intelligence evaluation of Lebron, administering the Raven's Progressive Matrices Non-Verbal Intelligence Test ("Raven's Test"). (AR 114-16.) Lebron's IQ score was below 36, which is considered very impaired, and Dr. Sherman diagnosed him with "moderate mental retardation." (AR 115-16.) Dr. Sherman, however, opined that the test results did not appear to be a valid estimate of Lebron's level of intellectual functioning, because his low score was inconsistent with his history and presentation. (AR 115.)

Expert witness Dr. Michael Friedman testified at the administrative hearing, and stated that the WAIS-R test was not an appropriate test for Lebron because he does not speak English. (AR 415.) The Raven's Test, according to Dr. Friedman, was the more appropriate test for Lebron, although he noted that various factors could depress an IQ score, and a score as low as 36 was "not expected." (AR 416, 418.) In Dr. Friedman's opinion, Lebron suffered from a

6

developmental disability and mental retardation. (AR 417-418, 420, 421.) However, Dr. Friedman found that Lebron's mental retardation was not severe enough to constitute a "listed impairment" in the relevant section of the Code of Federal Regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. (AR 419.) If Lebron was found to have a "listed impairment" by the ALJ, it would entitle him to immediate benefits without further analysis.

## APPLICABLE LAW

Pursuant to 20 C.F.R. §§ 404.1520 and 416.920, the Commissioner applies a five-step sequential evaluation process to determine if a claimant is entitled to SSI disability benefits:

(1) The Commissioner first considers whether the claimant is currently engaged in "substantial gainful activity."

(2) If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

(3) If so, the next inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations (the "listed impairments"). If so, then the Commissioner will consider him disabled without further inquiry.

(4) If the claimant does not have a listed impairment, the next inquiry is whether, despite his severe impairment, the claimant still has the "residual functional capacity" to perform his past work.

(5) If the claimant cannot perform his past work, the Commissioner will determine whether there is other work which he can perform based on his residual functional capacity.

See Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999).

In accordance with the sequential analysis, benefits can be denied to the claimant at steps one, two, four, or five, if the claimant does not meet the criteria set forth therein. A claimant may be found disabled, and benefits granted, at step three if he is found to have a "listed impairment," or at step five, if he has no residual capacity to perform past work, and no other work he can perform is available. See Dixon v. Heckler, 785 F.2d 1102, 1103 (2d Cir. 1986).

7

The disability claimant bears the burden of proving the first four steps. At the fifth step, the burden shifts to the Commissioner who must prove that the claimant is capable of performing other work. See Williams v. Apfel, 204 F.3d 48, 49 (2d Cir. 2000).

I. **Application of the Five-Step Sequential Process by ALJ Levin**

In reaching his decision dated July 13, 2003, ALJ Levin conducted this five-step sequential evaluation to determine if Lebron was disabled within the meaning of the Social Security Act. At step one, ALJ Levin found that Lebron had not engaged in substantial gainful activity during either the Dixon or Stieberger readjudication periods. (AR 21.) At step two, ALJ Levin determined that Lebron's mental retardation was "severe" within the meaning of the Social Security Act. (AR 21.) ALJ Levin also found, however, that Lebron had no concurrent mental or physical impairments during the relevant time periods. (AR 21.) At step three, ALJ Levin found that Lebron's severe impairment—mental retardation—did not meet or medically equal one of the "listed impairments" in 20 C.F.R. Pt. 404, Subpt. P, Appendix 1, § 12.05, and so he was not entitled to benefits at that step. (AR 21.) At step four of the sequence, ALJ Levin found that, despite his severe impairment during the Dixon readjudication period, Lebron had the residual functional capacity to perform his past work. (AR 21.) Accordingly, Lebron was not "disabled" as defined by the Social Security Act during the Dixon period. (AR 21.) With respect to the Stieberger readjudication period, ALJ Levin found that Lebron did not have any past relevant work, so he proceeded to the fifth and final step of the sequence. (AR 23.) At step five, for the Stieberger readjudication period, ALJ Levin found that work existed that Lebron could have performed. (AR 23.) Accordingly, ALJ Levin found that Lebron was not "disabled" according to the Social Security Act during the Stieberger readjudication period and therefore not entitled to benefits for that time. (AR 23.)

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

In the R&R, Magistrate Judge Fox conducted a thorough review of Lebron's medical and psychological history and ultimately recommended a remand for further development of the evidence. Magistrate Judge Fox agreed with a number of the findings of the ALJ but found error in parts of the ALJ's analysis and findings on other points, including the ALJ's use of the vocational expert's testimony and his explanation of Lebron's residual functional capacity.

Magistrate Judge Fox found that the Raven's Test was an appropriate intelligence test to administer to Lebron because it took into account his linguistic and cultural background. (R&R 18.) He found that ALJ Levin "did not err by failing to evaluate the plaintiff's 'adaptive functioning' and his performance in 'activities of daily living and social functioning' in lieu of considering valid IQ scores, when he determined whether the Plaintiff met listed impairment 12.05(C)" at step three of the sequential evaluation process. (R&R 18-19.) The Magistrate Judge also found that "[t]he ALJ's finding, that the plaintiff's IQ scores were invalid, was based on substantial evidence." (R&R 19.)

Regarding residual functional capacity at step four, however, the Magistrate Judge found that "[s]ince the ALJ failed to explain how he determined [Lebron's] residual functional capacity, the Court cannot find that his assessment was based on substantial evidence." (R&R 21.) The ALJ's:

> "certif[ication]" that the record "contains sufficient evidence to support the finding as to [Lebron's] residual functional capacity . . . that [the evidence relied upon] is explained in the testimony of medical experts," is insufficient to meet the requirement that the ALJ [] "include a narrative discussion describing how the evidence supports each conclusion" in the residual functional assessment.

(R&R 21 (internal citations omitted).)

Moreover, based on Lebron's significant non-exertional limitations, the Magistrate Judge found that the ALJ "erred in relying exclusively on the Medical Vocational Guidelines … [and] should have relied on testimony from a vocational expert." (R&R 22 (internal citations omitted).) Greene's testimony was based, in part, on "a hypothetical question, whose underlying assumptions did not reflect adequately [Lebron's] limitations." (R&R 22.) Magistrate Judge Fox concluded, therefore, that the ALJ erred at step five of the sequential evaluation. (R&R 23.)

Due to gaps in the administrative record, the Magistrate Judge recommended the case be remanded to the Commissioner for further development of the evidence. (R&R 23.) On remand, Magistrate Judge Fox recommended that the ALJ "must ensure that all Lebron's impairments are taken into account when determining his residual functional capacity, based on both Lebron's exertional and non-exertional limitations." (R&R 23.) Additionally, the "ALJ must determine, based on the testimony of a vocational expert, whether, despite all his limitations, Lebron could have performed work existing in the national economy . . . ." (R&R 23.)

## STANDARD OF REVIEW

### I.  Evaluation of Report and Recommendation

In evaluating the R&R of a Magistrate Judge, the district court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  When a timely objection has been made to the Magistrate Judge's recommendations, the court is required to review the contested portions de novo. See Pizarro v. Bartlett, 776 F. Supp. 815, 817 (S.D.N.Y. 1991).  For uncontested portions of the R&R, the court need only review the face of the record for clear error. See Wilds v. United Parcel Serv., Inc., 262 F. Supp. 2d 163, 169 (S.D.N.Y. 2003).

## II. Judicial Review of the Commissioner's Decision

In reviewing a decision of the Commissioner, the district court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). To review a Commissioner's final decision, "a district court must determine whether the correct legal standards were applied and whether substantial evidence supports the decision." Butts v. Barnhart, 388 F.3d 377, 384 (2d Cir. 2004) (citing Machadio v. Apfel, 276 F.3d 103, 108 (2d Cir. 2002)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).

The findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive, Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995), and these findings are not given de novo review, Halloran v. Barnhart, 362 F.3d at 31. However, "in cases where 'the ALJ failed to develop the record sufficiently to make' appropriate disability determinations, a remand for 'further findings [that] would so plainly help to assure the proper disposition of [the] claim … is particularly appropriate.'" Butts v. Barnhart, 388 F.3d at 386 (quoting Rosa v. Callahan, 168 F.3d 72, 83 (2d Cir. 1999)). However, where there is "'no apparent basis to conclude that a more complete record might support the Commissioner's decision, [the court has] opted simply to remand for a calculation of benefits.'" Id. at 385-86 (quoting Rosa v. Callahan, 168 F.3d at 83), see also Cabrera v. Astrue, No. 06 Civ. 9918 (JCF), 2007 WL 2706276, at **10-12 (S.D.N.Y. Sept. 18, 2007) (case remanded to the Commissioner solely for calculation of benefits because

there was no need to consider new evidence—plaintiff was entitled to benefits as of her fiftieth birthday).

Magistrate Judge Fox recommended that the Court deny Lebron's motion and instead remand the case to the Commissioner for additional administrative proceedings. The Magistrate also recommended imposing a 60-day time limit on the Commissioner on remand. Both Lebron and the Commissioner filed objections to the R&R. As to all findings of the Magistrate Judge that are not contested by either party, this Court adopts those recommendations, finding no clear error on the record. The contested portions of the R&R are reviewed below de novo.

### OBJECTIONS TO THE REPORT AND RECOMMENDATION

**I.  Objection to the Finding that Lebron Does Not Meet the Requirements of Section 12.05(C) for Mild Mental Retardation**

The Magistrate Judge recommended adopting the finding of the ALJ that Lebron does not meet the requirements of listing 12.05(C) of the Social Security Act for mild mental retardation (a "listed impairment") and therefore is not automatically entitled to benefits at step three of the five-step analysis.[8] Lebron objects, contending that he meets the listing in 12.05(C) and that the proper disposition of this case should therefore be reversal and remand solely for the calculation of SSI benefits due from July 28, 1982. According to Lebron, there is "no dispute that [he] has a valid diagnosis of mild mental retardation. In addition, there is unassailable evidence that [his] congenital disorder of the hands and feet impose at least 'minimal' functional limitations upon [his] physical ability to work." (Plaintiff's Objections to the Magistrate's Report and Recommendation ("Pl.'s Obj.") 1.) Lebron contends that "[t]hese two clear and undeniable

---

[8] Section 12.05(C) states: "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period . . . . The required level of severity for this disorder is met when requirements in A, B, C, or D are satisfied. … [C.] A valid verbal, performance or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

12

facts, when taken together, necessarily require a finding that [he] meets the Commissioner's definition of disabling mild mental retardation, listing 12.05(C)." (Pl.'s Obj. 1.)

To meet the Commissioner's listing 12.05(C), a claimant must satisfy a two-prong requirement; he must demonstrate: (1) a valid IQ score between 60 and 70, and (2) a physical or mental impairment that imposes at least some minimal limitation upon his ability to perform basic work functions. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05(C).

If a valid IQ score is not obtainable or available, the Social Security Administration recognizes an exception under §12.00(D)(6)(e) of the statute. In these cases, the ALJ:

> may consider exceptions to formal standardized psychological testing . . . where appropriate standardized measures for your social, linguistic, and cultural background are not available. In these cases, the best indicator of severity is often the level of adaptive functioning and how you perform activities of daily living and social functioning.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(6)(e).

Lebron asserts that—absent a valid IQ test—the ALJ should have applied the exception in § 12.00(D)(6)(e) to his case and considered his level of adaptive functioning and performance of activities of daily living to satisfy the first prong of 12.05(C). The exception only applies, however, when there is no appropriate standardized measure (i.e., no appropriate test), verbal or non-verbal, for the applicant's social, linguistic and cultural background. The Raven's Test was an appropriate intelligence test for Lebron; it took into account Lebron's linguistic and cultural background. Since a valid IQ test existed for Lebron, the exception does not apply.

The ALJ's conclusions are derived from consideration of Lebron's IQ score from an appropriate test. The fact that the ALJ rejected the score as invalid based on the administering physician's input does not mean that the test was improper. The ALJ was well within his

13

purview to deem the result invalid. Under these circumstances, the Court finds that the ALJ's decision to reject the IQ score as invalid was based on substantial evidence.

Since the ALJ found that Lebron had failed to satisfy the first prong of the 12.05(C) test (a valid IQ test), Lebron's argument that he meets the second prong of the test is moot. See Alvarado v. Barnhart, 432 F. Supp. 2d 312, 318 n.3 (W.D.N.Y. 2006) (finding it unnecessary to address the second prong of 12.05(C) when the first prong of the listing has not been met). Even so, the ALJ found that Lebron cannot meet the second prong of 12.05(C) because his physical impairments were determined not to be severe. Relying on the testimony of medical experts, ALJ Levin ultimately ruled that Lebron did not meet either required prong under 12.05(C) and was therefore not disabled under the SSA requirements.

Applying the appropriate standard of review of a Commissioner's decision, this Court finds that the ALJ applied the correct legal standards and that substantial evidence supports the finding that Lebron does not meet the 12.05(C) listing. The Court dismisses Lebron's objection to the Magistrate Judge's recommendation and adopts the ALJ's finding that Lebron does not meet the 12.05(C) listing.

**II.     Objection to the Timing Requirement for Future Administrative Proceedings**

The Magistrate Judge also recommended that the proceedings before the "ALJ should be completed within 60 days of the entry of the court's order in this action and, if the ALJ's decision is to deny Lebron benefits, the final decision of the Commissioner should be rendered within 60 days of the plaintiff's appeal from the ALJ's decision." (R&R 23.) The Commissioner objected, citing Heckler v. Day, 467 U.S. 104, 111-12 (1984), to argue that a time limit on proceedings on remand would be an "unwarranted intrusion into the administrative process." (Defendant's Objections to the Magistrate Judge's Report and Recommendation 1.)

The Court agrees that such a time limit would be an intrusion on the administrative process and declines to place a specific time requirement on the Commissioner in these factual circumstances. In light of the fact that it has been over seven years since Lebron's Dixon and Stieberger cases were readjudicated, and since Lebron is pursuing benefits from two decades ago, the Commissioner is urged by this Court to proceed expeditiously on remand. See Vazquez ex rel. Jorge v. Barnhart, No. 04 Civ. 7409 (GEL), 2005 WL 2429488, at *10 (S.D.N.Y. Sept. 30, 2005) (Court declined to place a specific time restriction on the Commissioner to complete administrative proceedings but urged the Commissioner to proceed expeditiously on a SSI disability claim that was over five years old.)

## CONCLUSION

For the reasons set forth above, the recommendation of the Magistrate Judge to remand the case for further development of the evidence is ADOPTED and the case is REMANDED to the Commissioner according to the recommendations of the R&R. The recommendation to resolve this matter within 60 days is not adopted; the Commissioner is instead urged to act as expeditiously as possible on remand of this long-delayed matter.

Dated: New York, New York
July 8, 2008

SO ORDERED

*Paul A. Crotty*
PAUL A. CROTTY
United States District Judge

15

Copies E-mailed To:

Christopher James Bowes
Center for Disability Advocacy Rights, Inc.,
841 Broadway,
Suite 605
Christopher J. Bowes 54 Coblestone Dr. Shoreham, NY 11786
(212)979-0505 (631)929-17
Fax: (631)929-1700
Email: chris@cedarlaw.org

Susan D. Baird
U.S. Attorney's Office, SDNY (St Andw's)
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2200
Fax: (212) 637-2750
Email: Susan.Baird@usdoj.gov


Via Interoffice Mail To:

Magistrate Judge Kevin N. Fox, Chambers 530